This is a case where the government sought a minimum mandatory 20-year term of imprisonment for Mr. Espinoza, had his view of the evidence, and failed to give Mr. Espinoza evidence it knew about to rebut the government's evidence. Why would it have been exonerating? Why would it have been exculpatory? I think the way the government painted this case was that he was the only one that had access to the car that highlighted that he had the security keys, highlighted he had total access, sole dominion control of the car. It was misleading because the car had been in his possession for eight days and the car had a checkered history. Let's go for all that. The car had previously been on its way as a stolen car to, what was it, Dubai or the UAE or someplace, and, gee, why give them free cocaine along with their brand new SUV? I mean, they'd have to pay for the cocaine. Well, apparently the car was seized by customs in, I think it was San Pedro, and it was on its way to UAE. Two and a half years earlier? Two years earlier. I think it was in November of 99. And because it was two years earlier, did you introduce any evidence about anybody else who might have had dominion or control over the car in that period of time before your client picked it up eight days before? No, I wasn't trial counsel, but apparently there was. I should ask, is there anything in the record? There's nothing in the record to show that that was done, nor did trial counsel introduce the fact that the car had been purchased so quickly. But I think there was evidence that he had bought it the eight days previous. So your theory is that if a car ever came into the possession of the U.S. government, having been seized for any reason whatsoever, that becomes exculpatory information. The government must seek it out and disclose it even though the defense already knows about it. Well, the defense knew about it as the brief, as I point out in the brief, on the eve of trial. Eve either means the evening before or the morning of the trial, whether we want to parse that word one way or another. But no, it's not our position that if the car was picked up because it had unpaid parking tickets, that that would be one thing. And this would be another reason. But why is this another? When I said I didn't think anybody would give free cocaine to the UAE purchaser, what I meant was it's not a seizure that would just naturally imply that there might be dope in the car, like if it was coming into the U.S. instead of going out. And I don't understand why it would tend to suggest to the jury that maybe somebody else put the dope in the car. Well, I think unless you assume as a matter of fact that all contraband is imported into the country, it's not exported, you probably would have a good argument or a good point. But I think there is evidence that drugs are exported out of this country also. So putting drugs into a car and then taking them to the UAE, which I don't believe anyone can conclude does not consume narcotics also, is a is a rational thing to do. Do they consume these kinds of cocaine in the UAE? Well, I'm not an expert on what they consume in the U.S. Just tell me what we should assume. We're supposed to say judicial notice that that indeed that indeed there is a traffic. Not only not only was this car used for, but there is trafficking and drugs between here and the UAE. I think there's trafficking and drugs, every possible combination of factors of the French connection case. There was a car coming from France that had heroin in the rocker panels. This is nothing. There's nothing unusual about concealing drugs in vehicles. Well, but that argument would be that what's the relevance of the government seizing it? There may be any car you buy, any used car you buy might have drugs concealed somewhere. Is the government obligated to find the whole ownership chain? Or it's only if the government happens to have seized the car one time? I think when there's a theory, I think when there's government activity like there was in this case where the government was involved by U.S. Customs in seizing a vehicle and then coming to court and disavowing any knowledge of the government's history of involving the car. I think that's something that's important. In this case, the prosecutor, it was troublesome. The prosecutor blew you off and then said things that just weren't so about how what the defense was suggesting was a total fantasy. But I'm still trying to get to the second part, the exculpatory part. I think you just had, I think you, what would have happened would have been that evidence would have been presented and a reasonable inference from that evidence could be the, or would be the argument that I'm making now. How long was the car in private hands after the UAE seizure? Well, the Customs took the car in November of 99 and it was sold by this auction company, I believe, eight days before the arrest of Mr. Espinoza. And that was November 8th of 01. So the record doesn't indicate where that car was from the time Customs seized it to the time it was sold at the auction. Is there any record evidence to show that the car, when it was initially seized, was not searched for narcotics? There's only a presumption that, there's actually, there's, you can't make any, if the officers seized the car because it was part of a fraud scheme, they may not have even assumed to search it for narcotics. And we know anecdotally from what happens at the Port of Entries in San Diego that people are buying auction cars, they're going to Mexico, they're coming back, and they're finding things in those cars that were not discovered previously. So this is not, this is not something that's a deus ex machina that's falling out of the sky. This is a relatively, not common, but a relatively frequent, well, I wouldn't say it's multi-frequent, but it happens so much now that it's part of the concerns that lawyers have that these cars have been sold at auctions. And then you look at the pedigree of the car. Is it any car sold at auction you're talking about? I would say, any car that's gone through government hands. I would say, first of all, any car that's sold at auction. And the second bell ringing would be any car that's been touched by government hands. And why does auction make a difference? Suppose somebody buys a car from me, which I've had for eight years. I think it would put everybody on notice to find out where the pedigree of your car was before you bought it. So, so now we're getting down to the, to the core of this thing. In your opinion, the government has the obligation of disclosing the pedigree of the cars or needs to put in evidence about the pedigree of every car involved in a border crossing. Is that correct? Only when the government is involved in the seizure. Why? Well, then let me put it your way. Any defense counsel who does not find the pedigree of a car, whether the government was involved or not, is ineffective. Is that your position? Any defense counsel at this point, knowing what we now know about these cars and options, and the fact of this case is if the government. I don't see what an option has to do with it. What I'm saying is the argument seems to be that any car you buy used may have drugs in it. It may have drugs in it. However, if the government was involved in a seizure of that car prior to you purchasing it, the government should be obligated to give you notice of that seizure. That wasn't done in this case. I understand your point. The government counsel basically pooh-poohed the argument. Counsel comes in and says, I have a suspicion. It's not enough to be evidence. In my view, it's not enough to be responsible questioning, just to ask questions without a firm basis for the allegation. And government counsel basically laughed it off, even though the government had been involved in the seizure. I'd like to save my last 120 seconds for rebuttal. Thank you. Your Honor, my name is Jason Ford. I'm here on behalf of the United States. You know, the prosecutor could have avoided, were you the prosecutor? Yes, Your Honor. You could have avoided a lot of trouble and some appellate risk by not blowing the defense off. They told you this. The prosecutor, the defense announced what their concern and their suspicion was. And you told the judge that the defense suspicion that the vehicle had been seized before was nothing other than sheer fantasy. In fact, not only wasn't it sheer fantasy, it was true. And you should have found out it was true. And you should have disclosed the records just in case they were exculpatory. And here we are instead. Well, Your Honor, let me explain to you, put those comments in context and explain to you all the factual background of this issue. First of all, you're of course correct. The statement I made, you're citing accurately, but the statement that I made followed two pages after the defense counsel's description of what it is she was suspecting. I'm referring to page 195 of the excerpt of record. About two-thirds of the way down, defense counsel states, I need to bring out to a witness what happens with these vehicles that are seized at the border. That is a critical distinction, Your Honor, because I didn't just blow off the defense counsel's statements. We ran a records check on this vehicle to determine whether it had ever been seized at the border. It had not. It did not show up in a records check. That was sheer fantasy. I thought it was a border, but it was going out instead of in. It was in a container. But the, well, Your Honor, the seaport in the customs databases is a different database for seizures at a seaport than at the border. At the border to Mexico, which is clearly the border to which defense counsel was referring. At least that's the strong indication. So I don't want Your Honor to think that we completely disregarded this. We did check. We checked the only database that we ever checked for border searches, the Treasury Enforcement Computer Service database. The text records were checked. It does not show up in the text records. To this day, it does not show up on the text records. In addition, Your Honor, I even, while we were in trial, ran a Carfax check on the vehicle from my home just to see. Nothing showed up. My reaction was far from blowing off this allegation. Because the next statement defense counsel made, Your Honor, further crystallized what it is she was talking about. And this, again, is at page 195 of the excerpts of record. I'll read from the court's comments first. What is the relevance of the ultimate seizure and loss of this vehicle to your defense? That's what I'm unclear about. Defense counsel responds that this vehicle was seized previously and had cocaine in it before my client bought the car. Your Honor, that is the context for my comments. That the defense counsel had said, one, that it was seized at the border, and two, that it was seized and had cocaine in it when it was seized. To this day, Your Honor, that is sheer fantasy. That simply was not the case. Your Honor, there is nothing I or any prosecutor takes more seriously than an allegation that we are somehow suppressing evidence that is favorable to the defense. No exculpatory evidence exists in this case. I apologize if Your Honor feels that my comments at sidebar were glib, but I assure you, I did not blow off the allegation from the defense counsel. We looked into it. The problem was, she did not inform us of all the information that she had. Had she told us, I have information that this vehicle was seized from a cargo container in Long Beach, we would have run a completely different database search. In fact, Your Honor, even after the trial, when she subpoenaed records from Customs, when she only provided the information of the VIN of the vehicle and the date of the seizure, which actually was a recovery, Customs was unable to determine that there were any records whatsoever of Customs ever having this vehicle. It was only after she received a response to her subpoena that she clarified and explained that it was actually seized at a seaport in Long Beach. Then, and only then, were they able to obtain the records, which by the way, Your Honors, were the exact same records that the National Insurance Crime Bureau had, to which the defense had access by counsel's own admission on the eve of trial. So, not only do we have no exculpatory evidence here, it's not newly discovered and it was not suppressed because the defense had just as much access to these records. In fact, for practical purposes, the defense had more access to these records because the defense counsel was actually aware of this recovery. And I don't think that's a point that I can emphasize too much, is that this vehicle was not recovered, was not seized, because it was used to further a crime, because it was carrying contraband. This vehicle, as the district court stated, was the contraband. This vehicle was being shipped to the UAE as part of a car theft and insurance fraud ring. None of the individuals involved in this ring have ever been charged with a narcotics violation, let alone convicted of a narcotics violation. In contrast to the statement in- Well, it's an interesting thing. It sounds like the defense had more information than the government, actually. I mean, literally, unless we say the government's amorphous and therefore you're deemed to know everything. But it didn't give it to the government. It just threw out an illusion and made up a record of error simply to do what it's doing now. I don't quite understand. I mean, frankly, I had thought that was the case. And I understand the court should be properly outraged when the government plays games. I'm not sure which side, I think, is playing games in this case. I can assure you- I don't think it was the government. I think it was being sandbagged, and the court was being sandbagged. And quite frankly, when the defense counsel first started asking these questions, when I first objected, and she was asking the questions about what happens to the vehicles when they're stopped at the border and when they're seized and they get auctioned off, in all honesty, I thought she was trying to garner some sympathy for the defendant. Because here he had just purchased this vehicle eight days ago, and the government's going to seize it and auction it off, and he's going to lose his expensive new vehicle. I had absolutely no idea where she was heading with this. We impressed upon the agent the absolute importance of making sure what this vehicle's history was, whether it had been seized by customs. As I stated, he looked in the text records. It's the only records in nearly five years as a prosecutor I've ever accessed for this type of issue. It did not show up in there. And the reality is, if you look at the excerpts of records. You spent most of your time having to justify what maybe doesn't need to be justified. Do you want to spend some time addressing any legal issue you think you should address? Well, quite frankly, I think that the issue that Judge Kleinfeld raised is the essence of the importance of this case to me. I would never want, Your Honors, to come away from this case, this snapshot of my performance as a prosecutor, as thinking that I in any way blow off issues concerning possible Brady evidence. The different databases really enlightened me. And you can see, Your Honor, if you look at pages in the excerpts of records. You'll see from pages 80 through 89 are the NICB database records. At the top, they say NICB. The customs databases, the one that reflected this vehicle, were at pages 7, 6, to 78. And you'll see, Your Honors, at the top there, it says CCAS information. It's a different database. It's the CCAS database because this is considered, it was a seaport. We just don't deal with seaport seizures in these border bus cases. And because the defense counsel stated that this was previously seized at the border, we had no reason to look in any database other than text. And it just didn't show up in there. In terms of any legal issues that are raised here, Your Honors, I think the legalities here are crystal clear. This evidence was not exculpatory and was not newly discovered. It was known to the defense prior to and during trial. They had access to as much information, even, Judge Fernandez, even if we do look at the government as being amorphous and having all information. They still had access to all of the information we had access to during trial. Am I correct in understanding that the material that they had obtained actually was not material held by the government? It was material held by a non-profit organization? That is correct, Your Honor. You'll see at the top of, in pages 80 through 89, you see at the top of that document information provided by NICB, and that's the National Injury and Crime Council. And quite frankly, it's more detailed than the information that Customs had, which comprises only three pages versus 10 pages that the NICB has. So this is stuff held by basically insurance companies?  And remember, Your Honors, this vehicle was recovered by Customs and immediately turned over to the California Highway Patrol. So we still to this day don't have information as to whether it was auctioned by CHP, to whom it was auctioned. That's still to this day is not in the hands of the federal government, Your Honors. Thank you. Thank you, Counsel. Your Honors, I'm concerned about the comment that Ms. Fernandez made about being sandbagged by the defendant in this case. It seems from my reading of the record that trial counsel learned either the day prior to trial when she was preparing or the morning of trial that this car had a history with the government. She raised that issue. She said she had a suspicion. And then trying to justify what she had, she probably went too far to say it involved cocaine. I don't see anything involved in the record. But all she was acting on when she went to court to ask Judge Miller about getting these records or justifying her questions was basically what she had heard in a telephone conversation, apparently, with somebody at the NICB. Well, correct. The point is she did have more information than she played out to the court. As you know, the organization did. And she talked to them. She did talk to them. You know, lawyering is a great thing. And our system is adversary. And we don't have to put all our cards on the table all the time. It just gets a little bit tricky when people start accusing other sides of being essentially evil. I'm turning it around is all for you. So, you know, it's not so neat to say that somebody is doing something wrong and is violating his duties and is being bad and is trying to mislead the court when, you know, those things can cut both ways if you want to read them that way. They certainly can. And I don't I don't think that the government has information that doesn't reveal that it's evil. I think there's there's just a mistake. It's wrong. And we can accuse other people of wrongdoing even when they're not doing anything wrong. And I don't know exactly what defense counsel knew. I'll never know that. I do know that the people she talked to had more information than she handed out when she was in court. She didn't say, well, you know, I found out this was a seaport thing. She didn't say anything of that to the court to put people on notice that there's someplace else to look. She may be perfectly decent and honest about it. I'm just telling you that it seems to me it's inappropriate to throw stuff at the other side. And I said what I did to government counsel by saying, hey, you know, we understand. And I'm saying the same thing to you. I understand, but it's a little bit tricky and tacky to kind of be painting the other side, I think. I've done this for a few years, so I understand how we swing mud around. And sometimes you feel that the end justifies the means. Unfortunately, in these cases, I think the courts hold the government to a high standard of obligations and responsibility, especially like in this case when the government seeks to put the defendant in custody for 20 years. That, to me, kind of highlights the responsibility the government has. It's somewhat different than counsel learning something the night before trial or the day before trial and then raising it as a way to justify her questions. And then during trial, issuing a subpoena for the documents and getting the documents after trial. So I understand the court's position, and it's difficult to sit here and to characterize things. But at the end of the day, the government has a greater responsibility than the defendant does because the government doesn't have to go do those 20 years. The defendant does. I understand the position. I know you're over time, but I wanted to ask one question. Is there any evidence in the record that Espinoza made a specific pretrial discovery request for any information regarding the previous owners? Your Honor, there is, but it's not that specific. In the first page of my opening brief argument, I quoted the discovery motion where counsel for Mr. Espinoza sought the items that I, ironically, this morning, I highlighted to myself. And if the court would look at page 14, I rather laboriously set forth her discovery request. And I highlighted contradiction of government evidence useful to the defense impeaching or otherwise detracting from the probative force of the plaintiff's evidence or which arguably could lead to such records or information, and then records or notes of communications about customs agents investigating this case on November 8, which isn't really the customs agency. All right. Thank you. Thank you, Your Honor. Thank you, counsel. United States v. Espinoza is submitted. Graves v. Terhune is submitted. Hernandez v. Smith is submitted. Martin v. Hernandez is submitted. Maldonado v. Alameda is submitted. We'll hear United States v. Hillman.
judges: D.W. Nelson, Fernandez, Kleinfeld